IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RENEE BILLINGSLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 2:05-cv-157-WKW |
| v. | ) | (WO) |
| | ) | |
| LABCORP, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Rene Billingsley ("Billingsley") brings this action against LabCorp, Inc. ("LabCorp"), alleging that it was negligent in testing and reporting her urine specimen as positive for cocaine. Billingsley contends that LabCorp's erroneous test results caused her damages, including the loss of her nursing license.

This cause is before the Court on the Motion for Summary Judgment (Doc. # 14) and Motion to Strike Plaintiff's Summary Judgment Exhibits D & E (Doc. # 33) filed by LabCorp. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the Court finds that the Motion for Summary Judgment is due to be GRANTED and the Motion to Strike is due to be DENIED as moot.

**I.  FACTS AND PROCEDURAL HISTORY**

The Court has carefully considered all deposition transcripts and documents submitted in support of and in opposition to the motion for summary judgment. The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following facts.

In December of 2002, Billingsley was a registered nurse employed by Long Term Care Hospital ("LTC") in Montgomery, Alabama. Billingsley voluntarily participated in the Alabama Board of Nursing's Nondisciplinary Nursing Approach for the Treatment, Rehabilitation, and

Monitoring for Chemical Dependence ("the Program"). Billingsley entered the Program in 1997 as a result of chemical dependence on Demoral, an opiate-based pain medication. As part of the Program, Billingsley was prohibited from ingesting opiate-based medication, including by prescription, and was required to submit to monthly random drug screens.

On two occasions in December of 2002, Billingsley participated in random urine drug screens yielding results which were positive for opiates. Because of these positive results, in January of 2003, the Alabama Board of Nursing ("ABN") instructed Billingsley to submit to a substance abuse evaluation by Medical Review Officer, Dr. Sandra L. Frazier ("Dr. Frazier"). ABN also instructed Billingsley that she could not return to work until the evaluation was completed. Due to her inability to work, Billlingsley informed LTC of ABN's directives.[1]

On the morning of January 8, 2003, Billingsley traveled to the University of Alabama in Birmingham ("UAB") to meet with Dr. Frazier. At the end of the evaluation, Dr. Frazier required Billingsley to submit a urine sample for drug screening. Dr. Frazier accompanied Billingsley to another office and Billingsley participated in the screening. Ninety minutes thereafter, having traveled from Birmingham to Prattville, Billingsley submitted another urine sample as part of the random testing required in the Program. Billingsley's first sample ("Sample A") was sent to LabCorp for testing, while her second sample ("Sample B") was sent to Quest Diagnostics, Inc. ("Quest Diagnostics"). LabCorp and Quest Diagnostics screened their respective samples and rendered dissimilar results: Sample A yielded positive results for the presence of cocaine whereas Sample B yielded negative results.

---

[1] Upon receiving this notice, LTC began an investigation into Billingsley's improper removal of opiate-based medication from its medication dispensing machine. This investigation ultimately led to Billingsley's termination from LTC on January 13, 2003.

2

On January 13, 2003, LabCorp reported its results of Sample A to Dr. Frazier. In turn, Dr. Frazier directed Billingsley to participate in an extensive drug rehabilitation treatment. On January 27, 2003, Billingsley admitted herself into the UAB Addiction Recovery Program to begin treatment with Dr. Frazier. Billingsley participated in the treatment for approximately seven days before she withdrew from the treatment. Upon her withdrawal from the treatment, ABN instructed Billingsley that she had three options: (1) return to the treatment, (2) voluntarily surrender her nursing license, or (3) face revocation of her nursing license for her failure to complete the treatment. ABN further instructed Billingsley that she had until April 15, 2003, to make her decision.

On February 18, 2003, LabCorp received a request to retest a portion of Sample A. LabCorp retested the specimen and, again, the presence of cocaine was confirmed. On February 26, 2003, LabCorp reported the retest results to Dr. Frazier.

On April 15, 2003, Billingsley voluntarily surrendered her nursing license. Six months thereafter, on October 20, 2003, LabCorp received a request to forward a portion of Sample A to Toxicology Associates ("Toxicology") for a retest of cocaine metabolites. Toxicology screened the specimen and reported negative results. Toxicology also screened a strand of Billingsley's hair and reported negative results.

On January 7, 2005, Billingsley filed a Complaint against LabCorp in the Circuit Court of Montgomery County, Alabama, alleging violations of the Alabama Medical Liability Act ("AMLA") and negligence. Billingsley alleges that LabCorp negligently performed the drug screening on her urine sample and improperly reported the results of the screening, thereby causing her to suffer, among other harm, loss of her nursing license and emotional distress. LabCorp removed the case to this Court on February 18, 2005, and filed an answer on February 23, 2005. (Docs. # 1 & 2.)

3

## II.  JURISDICTION AND VENUE

This Court exercises diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) [2] and 28 U.S.C. § 1441(a) (removal jurisdiction).  The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

## III.  STANDARD OF REVIEW

Under Rule 56 (c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323.   The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v.  Zenith*

---

[2]  Because more than $75,000 is in controversy and the plaintiff is a citizen of a different state than the defendant, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

*Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the court must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

*A.     Applicable Law*

When a federal court exercises jurisdiction based upon diversity of citizenship, the court is bound to apply the substantive law of the state in which it sits. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The *Erie* doctrine extends to choice-of-law questions, so that a court sitting in diversity must apply the forum state's conflict-of- law rules. *Strochak v. Federal Ins. Co.,* 109 F.3d 717, 719-20 (11th Cir. 1997) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Because Billingsley's claims sound in tort, Alabama's choice-of-law rules require this court to apply Alabama law:

> *Lex loci delicti* has been the rule in Alabama for almost 100 years. Under this principle, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred.

*Fitts v. Minnesota Min. & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991) (citations omitted).

*B.     Motion for Summary Judgment*

LabCorp argues that Billingsley's AMLA claim fails as a matter of law because the testing was not performed as part of LabCorp's delivery of health care services to Billingsley, therefore LabCorp is not a "health care provider" within the meaning of the AMLA. LabCorp also argues that

5

it is entitled to summary judgment because Billingsley has no expert medical evidence to establish that LabCorp breached the applicable standard of care and thereby caused injury to Billingsley. Billingsley agrees that her claim against LabCorp is not governed by the AMLA and therefore contends that she is not subject to the AMLA requirement of expert medical evidence. Billingsley contends that her AMLA claim alleged in Count I of the Complaint should be dismissed and that her negligence claim alleged in Count II of the Complaint[3] survives summary judgment despite the absence of expert medical evidence.

    1.    *AMLA Liability*

The AMLA governs medical-malpractice actions in Alabama. *Mock v. Allen,* 783 So. 2d 828, 832 (Ala. 2000). Its purpose is, among other things, to impose a duty upon health care providers "to exercise such reasonable care, diligence and skill" as other health care providers in the same general line of practice. Ala. Code § 6-5-484 (1975); *see also* Ala. Code § 6-5-548(a). The AMLA applies "[i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care." Ala. Code § 6-5-548(a) (1975).

Despite the parties' agreement and arguments to the contrary, the Court finds that Billingsley's claims against LabCorp are governed by the provisions of the AMLA. An entity is subject to liability under the AMLA if it falls within the definition of a "health care provider" as set forth in the AMLA. The AMLA defines "health care provider" as "[a] medical practitioner, dental

---

[3] Count II of the Complaint provides, in relevant part:

> [S]hould it be determined that this cause of action against the Defendant is not governed by the Alabama Medical Liability Act, then the Plaintiff pleads the following count as alternative relief.

(Doc. # 2, Compl. at ¶ 17.)

practitioner, medical institution, physician, dentist, hospital, or other health care provider as those terms are defined in Section 6-5-481." Ala. Code § 6-5-542(1) (1975). Although the Court agrees with the parties that LabCorp does not fall within the definitions of the terms "medical practitioner," "dental practitioner," "medical institution," "physician," "dentist," or "hospital," *see* Ala. Code § 6-5-481 (1975), the Court finds that LabCorp comes within the definition of "other health care providers."

Section 6-5-481(8) defines "other health care providers" as "[a]ny professional corporation or any person employed by physicians, dentists, or hospitals who are directly involved in the delivery of health services." The Alabama Supreme Court has held that a medical reference laboratory, such as LabCorp, is within the definition of "other health care provider" and is subject to the AMLA. *See Anderson v. Ala. Reference Labs.*, 778 So. 2d 806 (Ala. 2000). In *Anderson*, the court applied the AMLA to a laboratory in an action involving the laboratory's alleged negligent tuberculosis testing which was later determined to be incorrect due to contamination of the specimen. The court held that the laboratory was an "other health care provider" for the purposes of the AMLA because the patient's physician "employed, or engaged the services of," the laboratory and the testing was an integral part of the physician's delivery of health care services to the patient. *Id.* at 810 (relying on *Cackowski v. Wal-Mart Stores, Inc.*, 767 So. 2d 319 (Ala. 2000)) (applying AMLA to pharmacist).

Similarly, in this case, Dr. Frazier employed or engaged the services of LabCorp to test the urine specimen of her patient, Billingsley. The purpose of having LabCorp screen Billingsley's specimen was directly linked to Dr. Frazier's treatment and evaluation of Billingsley for substance abuse.[4] Thus, LabCorp's testing of Billingsley's specimen was an integral part of Dr. Frazier's

---

[4] The Court is not persuaded by the parties' argument that LabCorp's testing was performed solely as occupational drug screening and not as part of the delivery of health care services to Billingsley. Generally,

delivery of health care services to Billingsley. Indeed, after Dr. Frazier received LabCorp's results, she directed Billingsley to participate in extensive substance abuse treatment and counseling. Accordingly, this Court holds that LabCorp falls within the AMLA's definition of "other health care provider."

Billingsley argues that her claim is not subject to the AMLA because she is not seeking recovery for "medical injuries" and the AMLA only applies to "medical injuries" caused by health care providers. Although Billingsley properly argues that the AMLA only applies to "medical injuries," *see Taylor v. Smith*, 892 So. 2d 887, 893 (Ala. 2004), the Alabama Supreme Court has implicitly recognized that emotional distress is a "medical injury" for which the AMLA applies. *See Anderson*, 778 So. 2d 806 (applying AMLA to claims for false laboratory results which caused severe emotional distress, economic losses and loss of consortium); *Ex parte Addiction & Mental Health Servs., Inc.*, __ So. 2d __ , 2006 WL 1875459 at *3 (Ala. 2006) (noting mental and emotional distress as "medically related" injuries). Accordingly, as the Complaint in this action alleges damages for emotional distress, the Court finds that Billingsley's argument is without merit. Consequently, the Court concludes that Billingsley's claim is governed by the AMLA.[5]

---

occupational drug screening is performed for the benefit of the employer and is used for the sole purpose of employment decisions. Here, however, the drug screening, albeit related to Billingsley's occupation, was performed for the benefit of Dr. Frazier and was used by Dr. Frazier for the purpose of evaluating Billingsley's substance abuse treatment needs. The evidence before the Court, viewed in the light most favorable to Billingsley, indicates that she voluntarily participated in the Program, which is a plan for nurses to seek "[t]reatment, [r]ehabilitation, and [m]onitoring for [c]hemical [d]ependence." (Doc. # 16, Ex. 3, Program Agreement; Ex 5.) Dr. Frazier, who is a licensed physician, was Billingsley's designated Medical Review Officer for the Program and Billingsley received drug abuse treatment from Dr. Frazier. (*Id*. at Exs. 3, 5, and Ex. 9, Pl.'s Resp. to Def.'s Interrogs. at ¶ 5.) The specimen which LabCorp screened was submitted by Dr. Frazier and, based upon LabCorp's results, Dr. Frazier recommended extensive substance abuse treatment for Billinglsey and treated Billingsley in the rehabilitation unit at UAB. (*Id*. at Ex. 2, Pl.'s Dep. 174 & 180; *Id*. at Ex. 6.) Hence, the drug screening conducted by LabCorp was directly related to the condition for which Billingsley saw Dr. Frazier, namely, substance abuse treatment, and was significant to Dr. Frazier's further treatment of Billingsley.

[5] Because the Court finds that Billingsley's claim is governed by the AMLA, it pretermits discussion of her alternative negligence claim.

2.   *Expert Medical Evidence*

Having determined that Billingsley's claim is governed by the AMLA, the Court turns to the merits of her claim.

*"*In a medical-malpractice action, once the defendant health care provider offers in his, her, or its behalf expert testimony that makes a prima facie showing of a lack of negligence, the health-care provider is entitled to a summary judgment, unless the plaintiff produces substantial evidence indicating negligence." *Anderson*, 778 So. 2d at 810 (citing *Swendsen v. Gross,* 530 So. 2d 764, 768 (Ala. 1988)). In support of its motion for summary judgment, LabCorp offered the affidavit of Dr. Edward J. Cone ("Dr. Cone"); he is a chemist/forensic toxicologist and is a Board Certified Diplomate in Forensic Toxicology by the Forensic Toxicologist Certification Board. (Doc. # 16, Ex. 10, Cone Aff.)  In his affidavit, Dr. Cone states:

> [Sample A] was properly collected under chain of custody procedures according to forensic drug testing standards. The specimen was shipped to LabCorp and properly tested for drugs of abuse according to forensic drug testing standards. The specimen was properly reported as positive for cocaine metabolite and contained 461 ng/mL of benzoylecgonine (cocaine metabolite). The creatinine concentration of this specimen was determined to be 102.4 mg/dL. The remainder of the specimen was properly stored and upon request retested for cocaine metabolite by LabCorp. The cocaine retest confirmed the presence of cocaine metabolite. . . . [Sample B] was shipped to Quest Diagnostics and properly tested for drugs of abuse according to forensic drug testing standards. It was reported to be negative for cocaine metabolite at a cutoff concentration of 300 ng/mL. The creatinine concentration of [Sample B] was 56.8 mg/dL. The difference between these two results can be explained by the difference in creatinine content of the two specimens. As creatinine concentration in urine decreases, benzoylecgonine concentration decreases proportionately. Thus, the concentration of benzoylecgonine in [Sample B] would be expected to be approximately one-half that of [Sample A] and would not test positive for cocaine metabolite at a 300 ng/mL cutoff concentration. . . . [Sample B] contained cocaine metabolite, but was below the cutoff concentration designated for a positive test. . . . The Quest [Diagnostics] result supports the correctness of the positive cocaine test reported by LabCorp.

(*Id*. at 3-4.)  Dr. Cone opined:

9

> [I]t is my opinion that the urine test performed on [Sample A] was conducted appropriately by LabCorp in all respects and is definitive evidence of recent use of cocaine by [Billingsley.]

(*Id*. at 5.)  In regard to LabCorp's procedures, Dr. Cone further opined that "[a]ll handling, testing and reporting of the results for [Billingsley]'s urine specimen met the standards of care for forensic urine drug testing." (*Id*. at 7.)  Accordingly, the Court concludes that Dr. Cone's affidavit is sufficient to shift the burden of production to Billingsley to produce substantial evidence in support of her claim.

The AMLA requires that Billingsley prove by substantial evidence that "the [defendant] health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case." Ala. Code §§ 6-5-548(a), 6-5-549.  "As a general rule, in a medical-malpractice action, the plaintiff is required to produce expert medical testimony to establish the applicable standard of care and a breach of that standard of care, in order to satisfy the plaintiff's burden of proof." *Anderson*, 778 So. 2d at 811.  To present a jury question, the plaintiff must adduce some evidence indicating that the breach of the applicable standard of care caused the injury. *Rivard v. Univ. of Ala. Health Servs. Found., P.C.*, 835 So. 2d 987, 988 (Ala. 2002).  "However, '[a]n exception to this rule exists 'in a case where want of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and experience to understand it.'" *Id*.  See *Tuscaloosa Orthopedic Appliance Co. v. Wyatt*, 460 So. 2d 156, 161 (Ala. 1984).[6]

---

[6] The Alabama Supreme Court has recognized four situations as falling within the exception:

1) where a foreign instrumentality is found in the plaintiff's body following surgery; 2) where the injury complained of is in no way connected to the condition for which the plaintiff sought treatment; 3) where the plaintiff employs a recognized standard or authoritative medical text or treatise to prove what is or is not proper practice; and 4) where the plaintiff is himself or herself a medical expert qualified to evaluate the doctor's allegedly negligent conduct.

Billingsley has offered no expert medical testimony in support of her claim. Therefore, the issue before the Court is whether such evidence is required to prove negligence in this case. The Court finds that this inquiry is easily answered in the affirmative.

Drug screening requires a certain degree of specialized training and knowledge that puts an understanding of the acceptable standard of care beyond the common knowledge of the jury. Laymen do not have the background and knowledge, without expert testimony, to understand whether or not the drug screening has been properly performed. *See Anderson*, 778 So. 2d at 811 (quotation marks omitted) (addressing tuberculosis testing). The question of the proper procedures to follow when testing a urine sample or hair sample for the presence of illegal substances must be answered by expert testimony. The determination of what constitutes an improper method of urine testing or improper threshold for the detection of cocaine metabolites must be answered by experts in the field of toxicology and chemical drug testing. Accordingly, the Court finds that Billingsley was required to present medical expert testimony in opposition to LabCorp's motion for summary judgment and "the lack of such testimony results in a lack of proof essential to [her] case." *Id*. at 813. Because Billingsley has produced no expert testimony in support of her claim, LabCorp is entitled to summary judgment.[7]

C.   *Motion to Strike*

The Court now turns to LabCorp's Motion to Strike Plaintiff's Summary Judgment Exhibits D and E. (Doc. # 33.) LabCorp argues that exhibits D and E, which are the Toxicology test results, constitute inadmissible evidence which should not be considered in opposition to the motion for

---

*Anderson*, 778 So. 2d at 811 (quotation marks omitted). The Court finds that this case clearly does not fall within any of these situations, and Billingsley does not argue otherwise.

[7] In addition, the Court is not convinced that Billingsley can prove causation under this set of facts.

summary judgment. LabCorp contends that the exhibits are inadmissible because they constitute untrustworthy hearsay under Federal Rules of Evidence 801 and 803, and are scientifically unreliable under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).[8]

While it may be true that the exhibits at issue fail to comport with the requirements for business records under Federal Rule of Evidence 803(6) and the case law interpreting it, the Court finds it unnecessary to reach the merits of LabCorp's motion to strike. The Court has reviewed and considered the challenged exhibits and finds that nothing contained in them, whether properly admissible or not, would cause this court to deny LabCorp's motion for summary judgment. Consequently, the motion to strike is due to be DENIED as moot.

## V. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Labcorp's Motion for Summary Judgment (Doc. # 14) is GRANTED.

It is further ORDERED that LabCorp's Motion to Strike (Doc. # 33) is DENIED as moot.

The Clerk of the Court is DIRECTED to remove the above-styled case from the trial docket.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this 5th day of September, 2006.

                          /s/   W. Keith Watkins
                          UNITED STATES DISTRICT JUDGE

---

[8] The Court questions whether *Daubert* is applicable to the exhibits at issue because the Supreme Court's analysis in *Daubert* is predicated on expert testimony under Federal Rule of Evidence 702. 509 U.S. at 589. As previously discussed, Billingsley has not proffered any expert testimony in this case.